**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SAFETY SOCKET LLC, a Delaware limited liability company, | ) ) ) | |
| *Plaintiff*, | ) ) | Case No. 15-CV- |
| v. | ) ) | Judge |
| ACCURATE AEROSPACE, INC., a Pennsylvania corporation, | ) ) ) | |
| *Defendant.* | ) ) | |

## COMPLAINT FOR INJUNCTIVE AND MONETARY RELIEF

Plaintiff, Safety Socket LLC, (herein "Safety Socket" or "Plaintiff"), as and for its Complaint against Defendant, Accurate Aerospace, Inc. (herein "Accurate Aerospace" or "Defendant"), alleges as follows:

### I.  NATURE OF THE ACTION

1.     This is an action for trademark infringement, unfair competition and false designation of origin under the Trademark Act of 1946, as amended, 15 U.S.C. §§1051, *et seq.,* and for trademark infringement, unfair competition and deceptive trade practices under the laws of the State of Illinois, including the Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, *et seq*.

.     2.     Safety Socket brings this action to ensure that Accurate Aerospace has put a stop to a fraudulent scheme with potentially catastrophic consequences:  Accurate Aerospace has been, and may still be, passing off as aerospace-grade fasteners, commercial-grade fasteners which it falsely asserts have been manufactured by Safety Socket and certified as aerospace-grade.  Accurate Aerospace's false representations and certifications may cause non-aerospace-

grade fasteners to be used in the aerospace industry, including in civilian and military airplanes, among other equipment, where the safety of members of the public may be compromised.

3.      Moreover, Accurate Aerospace has utilized Safety Socket's trademarks in furtherance of its scheme, so that Safety Socket may be wrongfully-implicated in this dangerous fraud, with potentially devastating consequences to its reputation in the fastener industry and with the public in general, as well as to its relationships with its direct and indirect customers, including distributors, suppliers and end-users.

4.      Trading on the valuable goodwill and reputation associated with Safety Socket and its trademarks, Accurate Aerospace, on at least one occasion of which Safety Socket has just learned, has ordered commercial-grade fasteners from Safety Socket's distributor, modified them to give the appearance of aerospace-grade fasteners and then passed them off on its customer, representing them to be aerospace-grade fasteners, purportedly manufactured and certified by Safety Socket.

5.      Defendant's wrongful acts have been carried out with the intent to deceive and with knowledge of the harm these acts could inevitably cause to Safety Socket.  Accordingly, Safety Socket seeks, among other relief, injunctive relief, disgorgement of profits, actual damages and punitive damages against Accurate Aerospace.

6.      In addition, Accurate Aerospace's scheme violates one or more federal statutes as to which no private right of action exists, such as the Fastener Quality Act, 15 U.S.C. 5401 *et seq*.  Safety Socket has begun the process of taking all steps to notify all appropriate agencies with respect to Accurate Aerospace's wrongful conduct.

## II. <u>PARTIES</u>

7.      Plaintiff, Safety Socket LLC, is a Delaware limited liability company, duly

authorized, registered and doing business in Illinois with its principal location at 49 Prairie Parkway, Gilberts, Illinois, 60136. Safety Socket is primarily engaged in the business of manufacturing commercial and aerospace-grade steel and alloy fasteners for its federal government, military, aerospace and commercial customers. Safety Socket's fasteners are currently in use in jet engines, nuclear reactors, military battle tanks, naval guns, heavy earth-moving equipment; roller coasters and recreational vehicles, which are sold and utilized throughout the world.

8. Defendant, Accurate Aerospace, Inc., is a Pennsylvania company with its principal place of business located at 827 North Providence Road, Media, Pennsylvania, 19063. Upon information and belief, Accurate contracts with both private and government entities to supply equipment and parts for use throughout the United States in the aerospace and commercial transportation (other than motor vehicle) industries.

### III. JURISDICTION AND VENUE

9. This Court has personal jurisdiction over Defendant because, (i) upon information and belief, Defendant has engaged in continuous business activities in, and directed to, the State of Illinois and within this judicial district, and (ii) Defendant has knowingly and intentionally committed tortious acts aimed at, and causing harm within, the State of Illinois and this judicial district, from which the causes of action set forth herein arise.

10. This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1332(a)(1), 1338 and 1367, because (i) Plaintiff's claims are based on violations of the Lanham Act, as amended, 15 U.S.C. §§ 1051-1127 and (ii) Plaintiff and all of its individual members, on the one hand, and Defendant, on the other, are citizens of different states, and the amount in controversy exceeds $75,000 exclusive of interest

and costs.

11.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c) because, on information and belief, Defendant transacts business in this district and because events giving rise to the claims asserted herein have occurred, and will continue to occur, within this judicial district.   Additionally, the damage to Plaintiff and its intellectual property described herein occurs in this judicial district.

## IV.  FACTS COMMON TO ALL COUNTS

### A.  PLAINFIFF'S BUSINESS AND MARKS

12.     Safety Socket is primarily engaged in the business of manufacturing commercial and aerospace-grade steel and alloy fasteners for its federal government, military, aerospace and commercial customers.  Safety Socket's fasteners are currently in use in, among other things, jet engines, nuclear reactors, military battle tanks, naval guns, heavy earth-moving equipment; roller coasters and recreational vehicles, which are sold and utilized throughout the world.

13.     Since its founding in 1931 as Safety Socket Screw Corporation, Safety Socket has developed and maintained a reputation for consistently manufacturing fasteners of quality and performance that exceeds the applicable requirements in high-strength, critical applications. Safety Socket's staff of engineers employs protocols that subject their fasteners to mechanical and performance tests well beyond their installation requirements in both commercial and aerospace or military contexts.

14.     Based on its reputation for reliability and quality, Safety Socket has become an approved commercial supplier for, among others, Siemens Energy & Automation, Polaris, Caterpillar, Harley Davidson, GE- Locomotive, GE- Medical Systems, Disney World, Bendix, Toro, Komatsu, Cummins Engine, General Motors, Ford Motor Co., Chrysler and Solar

Turbines. In addition, Safety Socket is an approved aerospace/military supplier for, among others, Hamilton Sundstrand, Rolls Royce, Lockheed Martin, Hartzell Propeller, BAE Systems, General Dynamics, MOOG, Woodward Governor, Bombardier, Newport News, Defense Logistics Agency, Sikorsky, Rafael and United Technologies.

15. Safety Socket is included in the "Department of Defense Handbook Listing of Fastener Manufacturer's Identification Symbols," also known as "MIL-HDBK-57F." This listing serves as verification to the military and aerospace industry that Safety Socket is an approved manufacturer of, among other things, aerospace-grade fasteners.

16. Pertinent here, Safety Socket owns and uses the following trademarks: (a) banded-knurl screw cap (the "Banded Knurl Mark"), in exclusive and continuous use since 1960, PTO Reapplication Ser. No. 86323543; (b) SAFETY SOCKET (name and word mark), in exclusive and continuous use since 1931; and (c) SAFETY SOCKET and Design, in exclusive and continuous use since 2004, (collectively, the "Safety Socket Marks"). Safety Socket also owns a stylized SAF mark, Registration No. 3953697 (the "SAF Mark"), which is included in MIL-HDBK-57F and has been used exclusively and continuously by Safety Socket since 2010 on its aerospace-grade fasteners.

**B. DEFENDANT'S BUSINESS**

17. Accurate Aerospace is a wholesale supplier of equipment and parts for use in the aerospace and commercial transportation industry, and contracts with entities in both the government and private sectors.

18. Accurate Aerospace is a contractor with both the Department of Defense and the Department of Homeland Security, as advertised on the worldwide website known as "Find The Best." *See* http://government-contractors.findthebest.com/l/334712/Accurate-Aerospace-Inc-in-

Media-PA).

19.     Accurate Aerospace also is listed as a United States government contractor at www.GovExec.com (contractor number 1663) and www.fedspending.org (search "Accurate Aerospace").

20.     Accurate Aerospace also advertises in the online Aviation Buyers Directory, which describes itself as "the Source for Spare Parts and Maintenance . . . For: Airlines, Business Aviation, Military, Helicopters." *See* http://issuu.com/abdonline/docs/abdfall11 at pp. 5, 225, 134, 143, 147, 158 and 177.  Accurate Aerospace can also separately be found on the Aviation Buyers Directory's own website, www.abdonline.com.

21.     Accurate Aerospace also is listed as a seller of "Aircraft Equipment Parts & Supplies" in "Air Union," an online guide for goods and services for the "U.S. Aerospace Industries & Airports." *See* www.airunion.us/company-accurate-aerospace-inc-in-media-pa-11598.

22.     Upon information and belief, Accurate Aerospace does business with the Boeing Company in Chicago, Illinois.

### C.  DEFENDANT'S FRAUDULENT USE OF PLAINTIFF'S MARKS

#### 1.  Century Orders Aerospace-Grade Fasteners From Accurate Aerospace.

23.     Sometime prior to February 17, 2015, Century Fasteners Corporation ("Century"), a New York-based seller of commercial and aerospace fasteners, contacted Accurate Aerospace and requested a quote for aerospace-grade socket head cap screws, which Century needed for one of its customers.

24.     The screws that Century needed are known in the industry as "NAS1352-10-56P," which must be "FF-S-86-qualified," a federal specification that covers socket-head cap screws

suitable for use in the military and aerospace industry.

25.     Upon information and belief, Accurate Aerospace responded with a quote and a delivery date of February 17, 2015, for what were supposed to be the aerospace-grade screws that Century was seeking, and Century accepted the quote.

**2.     Accurate Aerospace Obtains Safety Socket's Non-Aerospace Fasteners And Certifications, Both Bearing the Safety Socket Marks, For Century's Order.**

26.     Accurate Aerospace then contacted Kanebridge Corporation ("Kanebridge"), which is Safety Socket's distributor for commercial-grade (*i.e.*, non-aerospace-grade) fasteners, and, upon information and belief, placed an order for 500 5/8-11 x 3 1/2, commercial-grade socket head cap screws manufactured by Safety Socket.  Kanebridge is a New Jersey corporation that is licensed and does business in Illinois, with a warehouse in Elgin, Illinois.

27.     The screws that Kanebridge delivered to Accurate Aerospace were inscribed with Safety Socket's Banded Knurl Mark and included Safety Socket's non-aerospace certification (the "Safety Socket Certification") for "Lot Number 06948-0000" of non-aerospace Safety Socket cap head screws (the "Non-Aerospace Safety Socket Screws") from which Century's order was filled.

28.     The Safety Socket Certification includes two of the Safety Socket Marks: SAFETY SOCKET (name and word mark) and SAFETY SOCKET and Design.  A copy of Accurate Aerospace's shipping documents for the fasteners it sold to Century, which includes the Safety Socket Certification, is attached hereto as Exhibit A.  The Safety Socket Certification (with its supporting third-party certifications) is pages 2 through 6 of Exhibit A.

29.     There are three third-party certifications that are included with the Safety Socket Certification (Exhibit A, pp. 3-6), which tell the story of a portion of the testing, processing and inspecting that were involved in creating the Non-Aerospace Safety Socket Screws.  As set forth

below, Accurate Aerospace used these certifications (in some cases altering them), which include the Safety Socket Marks, as part of their scheme to pass off their doctored version of the Non-Aerospace Safety Socket Screws, falsely representing them to Century as aerospace-grade Safety Socket cap head screws.

30.     The "Charter Steel Test Report" (Exhibit A, p. 3) is a certification that the raw material, *i.e.*, the steel, from which Safety Socket manufactured the Non-Aerospace Safety Socket Screws (the "Certified Steel"), meets the industry requirements for both commercial and aerospace fasteners.

31.     Because Safety Socket uses aerospace quality steel for even its non-aerospace fasteners, Accurate Aerospace was able to supply an aerospace-grade certification for the steel that was used for the Non-Aerospace Safety Socket Screws, which Accurate Aerospace delivered to Century.

32.     Using the Certified Steel, Safety Socket produced unfinished fasteners which it sent to South Holland Metal Finishing Co. Inc., an Illinois corporation located in Monee, Illinois ("South Holland"), for processing that included heat treating and core hardness testing.  South Holland's certification (Ex. A, p. 5), performed on November 13-18, 2013, shows that the core hardness of the Safety Socket Non-Aerospace Screws tested in the range of 40.1 to 40.8, which is within acceptable parameters for aerospace-grade fasteners, as established by the National Aerospace Standards ("NAS") Committee.

33.     Because Safety Socket heat treats even its non-aerospace fasteners to acceptable aerospace specifications, Accurate Aerospace was able to supply an NAS-quality certification for the core hardness of the doctored Non-Aerospace Safety Socket Screws it sold to Century.

34.     South Holland then sent the screws back to Safety Socket where Safety Socket's

engineers performed their own testing, including a verification of tensile strength and hardness, before sending the screws to Belmont Plating Works, Inc., an Illinois corporation located in Franklin Park, Illinois ("Belmont").

35.     As shown by its certification (Ex. A, p. 6), Belmont coated approximately 8,036 Non-Aerospace Safety Socket Screws with black oxide during the period between November 27 and December 2, 2013.

36.     Upon receiving them back from Belmont, Safety Socket's engineers tested and inspected, among other things, the coating quality and post-coating gauge of the Non-Aerospace Safety Socket Screws, before shipping them to its distributor, Kanebridge. Accordingly, Safety Socket's certification (Ex. A., p. 2) shows a manufacturing date of December 5, 2013, which is the date, following all necessary certifications, internal inspections and testing, that Safety Socket deemed Lot 06948 -- the Non-Aerospace Safety Socket Screws bearing the Banded Knurl Mark -- to have been fully manufactured and ready for distribution for commercial users.

### 3.     Accurate Aerospace Doctors The Screws And Their Certification And Misrepresents Their Origin And Quality.

37.     Accurate Aerospace knew that it could not pass off the black oxide coated Non-Aerospace Safety Socket Screws it received from Kanebridge, which were black in color, as aerospace-grade fasteners, because one of the hallmarks of the NAS1352-10-56P fastener that Century ordered is its yellowish color, which results from the required cadmium plating and chromate coating processes.

38.     Therefore, Accurate Aerospace sent the Non-Aerospace Safety Socket Screws to Imperial Electro Plating, a New Jersey company located in Lyndhurst, New Jersey ("Imperial"). As shown in Imperial's certificate (Ex. A, p.7), dated February 10, 2015 (the "Imperial Certificate"), Imperial plated the black oxide screws with a "Flash Cadmium/Yellow" treatment,

which, while not an approved FF-S-86 plating process, created fasteners (the "Doctored Cap Screws") with a yellow appearance similar to that of an FF-S-86-qualified fastener.

39. As stated in the Safety Socket Certification (Ex. A, p.2), plating the Non-Aerospace Safety Socket Screws in this manner (or any manner outside of Safety Socket's process chain) voided all of Safety Socket's warranties and invalidated its certifications with respect to the Doctored Cap Screws.

40. Had Safety Socket intended to manufacture FF-S-86-qualified fasteners rather than the Non-Aerospace Safety Socket Screws, it would have followed a different, more rigorous processing protocol when manufacturing them, would have manufactured them to slightly different dimensions, and would have head-marked them using their SAF Mark.

41. Imperial's Certification states that the fasteners were "processed in accordance with: Flash Cadmium/Yellow per QQ-P 416 Type II" (Ex. A., p.7). This appears to be an attempt to suggest aerospace-grade plating, without providing the full details for FF-S-86 compliance, which would have been described as "CAD Yellow for FF-S-86 Type II Class 2." Flash Cadmium is not an acceptable substitute under FF-S-86 requirements for full Cadmium plating.

42. In an effort to give the impression that the Doctored Cap Screws sold to Century were not only FF-S-86-compliant, but were Safety Socket's product (which, following Imperial's tampering, they no longer were), Accurate Aerospace inserted the Imperial Certificate into the Safety Socket Certification as the last page.

43. The Imperial Certificate identifies the Doctored Cap Screws as follows:

NAS1352-10-56 + NAS1352-10-56P
5/8 -11 X 3 1/2 Alloy STL SHCS + 5/8-11X3 1/2 Cadmium II Alloy STL SHCS
Safety Socket                                                   LOT# 06948-0000

Ex. A, p.7.

44.     To be designated as NAS1352, a fastener must meet the specifications contained in the drawing by the National Aerospace Standards Committee for that part, which requires, among other things, that the fastener meet the FF-S-86 procurement specification. Thus, the NAS1352 prefix unambiguously signifies to the aerospace industry that the fastener being sold with this certification is FF-S-86-qualified.

45.     With the insertion of the SAFETY SOCKET word mark and the Lot Number matching the Safety Socket Certification (Ex. A, p.2), the Imperial Certification falsely represents that the fasteners being sold under this certification are FF-S-86 aerospace-grade fasteners manufactured by Safety Socket.

46.     Accurate Aerospace repeats these false designations of origin and quality in its invoice to Century (the "Accurate Invoice"). Ex A, p.1. The first item being shipped to Century is listed as "NAS1352-10-56P." Once again, the NAS1352 prefix unambiguously and falsely signifies to the aerospace industry that the fastener being sold pursuant to the Accurate Invoice is FF-S-86-qualified.

47.     The second item on the Accurate Invoice is "Full Certs", with the description "MFG: SAFETY SOCKET[,]LOT# 06948-0000. Ex A, p. 1. Yet again, Accurate Aerospace uses the SAFETY SOCKET name and word mark, tying it to the Lot Number from the Safety Socket Certification, to pass off the Doctored Cap Screws as aerospace-grade Safety Socket fasteners.

48.     Another blatantly deceptive act by Accurate Aerospace was scratching out the identity of Safety Socket's customer, Kanebridge, on the Safety Socket Certification (Ex. A., p. 2). As Accurate Aerospace and other companies doing business in the commercial and

aerospace fastener industry are well-aware, Safety Socket would not normally ship FF-S-86-qualified fasteners to Kanebridge, which is its distributor for commercial-grade fasteners.

49.     Accurate Aerospace's only conceivable purpose in scratching out Kanebridge's identity was to conceal the true non-aerospace nature of the fasteners it was passing off to Century as aerospace-grade, Safety Socket fasteners.

### 4.     Accurate Aerospace Intends To Profit From Its Fraud.

50.     Accurate Aerospace could only profitably obtain aerospace-grade fasteners directly from a manufacturer, such as Safety Socket, whose identifying mark is included in MIL-HDBK-57F, as a verified provider of military and aerospace-grade fasteners.  Ordering the NAS1352-10-56P fasteners from Safety Socket, who would have then manufactured them to-order, would have taken significantly more time than buying them directly from a distributor of aerospace-grade fasteners.  However, had Accurate Aerospace ordered the fasteners from a distributor of aerospace-grade fasteners, Accurate Aerospace would have paid a mark-up, significantly cutting into the profit it could have made upon re-selling them Century.  In sum, the cheapest, fastest way to get fasteners to its customer, albeit doctored, non-conforming fasteners, was by doing what Accurate Aerospace did, *i.e*., acquiring the readily-available commercial screws through Safety Socket's commercial distributor, Kanebridge, and then quickly plating and shipping them.

51.     In addition, the FF-S-86-qualified fasteners that Century wanted would have cost Accurate Aerospace significantly more to acquire than the Non-Aerospace Safety Socket Screws it obtained from Kanebridge.  Upon information and belief, Accurate Aerospace's profit margin on its sale to Century would have been between 60 and 70%, whereas the typical profit margin on a sale of comparable commercial-grade fasteners is between 10 and 20%.

**D. ACCURATE AEROSPACE'S ACTIONS ARE LIKELY TO CAUSE HARM TO THE PUBLIC AND TO SAFETY SOCKET.**

52.     The harm potentially caused to property and members of the public by the doctoring of fasteners designed for use in airplanes, amusement park rides and military equipment is significant.  The Doctored Screws were not subjected to the rigorous FF-S-86 protocols for, among others, tensile strength, corrosion resistance, precision sizing, embrittlement and core hardness.  The failure of one of these fasteners when subjected to repeated stress at the upper limits of FF-S-86 durability may result in a critical failure in its particular implementing environment, potentially causing substantial personal injury or death.

53.     In addition, the extent of the proliferation of the Doctored Socket Screws is, at this time, unknown.  Unknown end users may be confused as to whether these fasteners are safe for aerospace use.

54.     Moreover, in the tragic event that an accident does occur, proper investigation may be hampered by confusion over the actual nature of the Doctored Socket Screws.  Safety Socket may be wrongly implicated as (a) a participant in Accurate Aerospace's scheme of doctoring fasteners, (b) the manufacturer of the Doctored Socket Screws and (c) a responsible party who should be held accountable and liable for any such accident.

55.     All of the foregoing will cause undeserved damage to Safety Socket's reputation as a provider of safe, reliable quality fasteners to the commercial and aerospace industry.

## V. COUNTS

### FIRST CAUSE OF ACTION
**(Trademark Infringement Under 15 U.S.C. §1125(a))**

56.     Plaintiffs incorporate by reference the preceding paragraphs 1 through 55 as if fully set forth herein.

57.     Plaintiff's Safety Socket Marks are inherently distinctive, acquiring distinction from other marks through Plaintiff's long, continuous and exclusive use of the Banded Knurl Mark since 1960, the SAFETY SOCKET word mark since 1931, and the SAFETY SOCKET and Design mark since 2004.

58.     Due to the foregoing and Plaintiff's consistently positive publicity and advertising to its consumer community under the Safety Socket Marks, these marks have become uniquely associated with Plaintiff and identify Plaintiff as the source of Plaintiff's product.

59.     Defendant's use in commerce of the Safety Socket Marks without the consent of Plaintiff has been, and will continue to be, likely to cause confusion, mistake or deception among the public and/or Plaintiff's direct or indirect customers as to the affiliation, connection or association of Plaintiff with Defendant.

60.     Defendant's use in commerce of the Safety Socket Marks without the consent of Plaintiff falsely suggests that Defendant's goods and services are connected with, sponsored by, affiliated with and/or related to Plaintiff and its products and services marketed under the Safety Socket Marks.

61.     Defendant's unauthorized use of Plaintiff's Safety Socket Marks in connection with Defendant's goods and services constitutes trademark infringement in violation of 15 U.S.C. §1125(a).

62.     Defendants have acted with knowledge of Plaintiff's Safety Socket Marks and with (a) deliberate indifference to the injury to the public and to Safety Socket that will be caused by its trademark infringement and (b) the intent to unfairly benefit from the goodwill symbolized by the Safety Socket Marks.

63.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered, and

is continuing to suffer, irreparable injury to its business reputation and loss of goodwill and has incurred, and is continuing to incur, monetary damages.

64.    Plaintiff is entitled to an accounting for Defendant's profits on infringing goods and is entitled to recover from Defendant all damages sustained by Plaintiff as well as profits realized by Defendant as a result of Defendant's wrongful acts.  Plaintiff is presently unable to ascertain the full extent of monetary damages it has suffered and which it is entitled to collect from Defendant by reason of Defendant's acts of trademark infringement.

65.    Defendant will continue, unless restrained, to use Plaintiff's Safety Socket Marks, which will cause irreparable harm to Plaintiff.  Plaintiff has no adequate remedy at law for Defendant's conduct.  Plaintiff is entitled to an injunction restraining Defendant, its officers, agents and employees, and all persons acting in concert with Defendant, from engaging in further acts of trademark infringement.

66.    Plaintiff is entitled to corrective advertising, at Defendant's expense, in an amount and manner to be determined, for the purposes of (a) insuring public safety and freedom from confusion and (b) mitigating the damages to Plaintiff's reputation caused by Defendant.

67.    Due to the willful and exceptionally egregious nature of Defendant's wrongful acts, Plaintiff is entitled to an award of its attorneys' fees and costs associated with this lawsuit as well as treble damages pursuant to 15 U.S.C. § 1117(a).

## SECOND CAUSE OF ACTION
**(Unfair Competition and False Designation of Origin Under 15 U.S.C. §1125(a))**

68.    Plaintiff incorporates by reference the preceding paragraphs 1 through 67 as if fully set forth herein.

69.    Plaintiff's Safety Socket Marks are inherently distinctive, acquiring distinction from other marks through Plaintiff's long, continuous and exclusive use of the Banded Knurl

Mark since 1960, the SAFETY SOCKET word mark since 1931, and the SAFETY SOCKET and Design mark since 2004.

70.     Due to the foregoing and Plaintiff's consistently positive publicity and advertising to its consumer community under the Safety Socket Marks, these marks have become uniquely associated with Plaintiff and identify Plaintiff as the source of Plaintiff's product.

71.     Defendant's use in commerce of the Safety Socket Marks without the consent of Plaintiff has been, and will continue to be, likely to cause confusion, mistake or deception among the public and/or Plaintiff's direct or indirect customers as to the origin, sponsorship, or approval by Plaintiff of Defendants' goods, services or commercial activities.

72.     Defendants' unauthorized use of Plaintiff's Safety Socket Marks in connection with Defendant's confusingly similar goods constitutes unfair competition and a false designation of origin in violation of 15 U.S.C. § 1125(a).

73.     Defendants have acted with knowledge of Plaintiff's Safety Socket Marks and with (a) deliberate indifference to the injury to the public and to Safety Socket that will be caused by its trademark infringement and (b) the intent to unfairly benefit from the goodwill symbolized by the Safety Socket Marks.

74.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered, and is continuing to suffer, irreparable injury to its business reputation and loss of goodwill and has incurred, and is continuing to incur, monetary damages.

75.     Plaintiff is entitled to an accounting for Defendant's profits on infringing goods and to recover from Defendant all damages sustained by Plaintiff as well as profits realized by Defendant as a result of Defendant's wrongful acts. Plaintiff is presently unable to ascertain the full extent of monetary damages it has suffered and which it is entitled to collect from Defendant

by reason of Defendant's acts of trademark infringement.

76.     Defendant will continue, unless restrained, to use Plaintiff's Safety Socket Marks, which will cause irreparable harm to Plaintiff. Plaintiff has no adequate remedy at law for Defendant's conduct. Plaintiff is entitled to an injunction restraining Defendant, its officers, agents and employees, and all persons acting in concert with Defendant, from engaging in further acts of trademark infringement.

77.     Plaintiff is entitled to corrective advertising, at Defendant's expense, in an amount and manner to be determined, for the purposes of (a) insuring public safety and freedom from confusion and (b) mitigating the damages to Plaintiff's reputation caused by Defendant.

78.     Due to the willful and exceptionally egregious nature of Defendant's wrongful acts, Plaintiff is entitled to an award of its attorneys' fees and costs associated with this lawsuit as well as treble damages pursuant to 15 U.S.C. § 1117(a).

## THIRD CAUSE OF ACTION
### (Trademark Infringement Under Illinois Law)

79.     Plaintiff incorporates by reference the preceding paragraphs 1 through 78 as if fully set forth herein.

80.     Plaintiff's Safety Socket Marks are inherently distinctive, acquiring distinction from other marks through Plaintiff's long, continuous and exclusive use of the Banded Knurl Mark since 1960, the SAFETY SOCKET word mark since 1931, and the SAFETY SOCKET and Design mark since 2004.

81.     Due to the foregoing and Plaintiff's consistently positive publicity and advertising to its consumer community under the Safety Socket Marks, these marks have become uniquely associated with Plaintiff and identify Plaintiff as the source of Plaintiff's product. Plaintiff's

Safety Socket Marks are valid trademarks under the common law of Illinois.

82.     Defendant's acts constitute trademark infringement under the common law of Illinois.

83.     Defendants have acted with knowledge of Plaintiff's Safety Socket Marks and with (a) deliberate indifference to the injury to the public and to Safety Socket that will be caused by its trademark infringement and (b) the intent to unfairly benefit from the goodwill symbolized by the Safety Socket Marks.

84.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered, and is continuing to suffer, irreparable injury to its business reputation and loss of goodwill and has incurred, and is continuing to incur, monetary damages.

85.     Plaintiff is entitled to an accounting for Defendant's profits on infringing goods and to recover from Defendant all damages sustained by Plaintiff as well as profits realized by Defendant as a result of Defendant's wrongful acts.  Plaintiff is presently unable to ascertain the full extent of monetary damages it has suffered and which it is entitled to collect from Defendant by reason of Defendant's acts of trademark infringement.

86.     Defendant will continue, unless restrained, to use Plaintiff's Safety Socket Marks, which will cause irreparable harm to Plaintiff.  Plaintiff has no adequate remedy at law for Defendant's conduct.  Plaintiff is entitled to an injunction restraining Defendant, its officers, agents and employees, and all persons acting in concert with Defendant, from engaging in further acts of trademark infringement.

87.     Plaintiff is entitled to corrective advertising, at Defendant's expense, in an amount and manner to be determined, for the purposes of (a) insuring public safety and freedom from confusion and (b) mitigating the damages to Plaintiff's reputation caused by Defendant.

88.     Due to the willful and exceptionally egregious nature of Defendant's wrongful acts, Plaintiff is entitled to and seeks hereby, among other damages, an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**(Unfair Competition Under Illinois Law)**

89.     Plaintiff incorporates by reference the preceding paragraphs 1 through 88 as if fully set forth herein.

90.     Plaintiff's Safety Socket Marks are inherently distinctive, acquiring distinction from other marks through Plaintiff's long, continuous and exclusive use of the Banded Knurl Mark since 1960, the SAFETY SOCKET word mark since 1931, and the SAFETY SOCKET and Design mark since 2004.

91.     Due to the foregoing and Plaintiff's consistently positive publicity and advertising to its consumer community under the Safety Socket Marks, these marks have become uniquely associated with Plaintiff and identify Plaintiff as the source of Plaintiff's product.  Plaintiff's Safety Socket Marks are valid trademarks under state and federal law.

92.     Defendant's unauthorized and infringing use of the Safety Socket Marks constitutes unfair competition with Plaintiff under the common law of Illinois, in that such use enables Defendant, unfairly and through deceptive means, to obtain the benefit of, and trade upon, the widespread recognition and goodwill of Plaintiff in, among other places, its industry.

93.     Defendants have acted with knowledge of Plaintiff's Safety Socket Marks and with (a) deliberate indifference to the injury to the public and to Safety Socket that will be caused by its trademark infringement and (b) the intent to unfairly benefit from the goodwill symbolized by the Safety Socket Marks.

94.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered, and

is continuing to suffer, irreparable injury to its business reputation and loss of goodwill and has incurred, and is continuing to incur, monetary damages.

95.     Plaintiff is entitled to an accounting for Defendant's profits on infringing goods and to recover from Defendant all damages sustained by Plaintiff as well as profits realized by Defendant as a result of Defendant's wrongful acts.  Plaintiff is presently unable to ascertain the full extent of monetary damages it has suffered and which it is entitled to collect from Defendant by reason of Defendant's acts of trademark infringement.

96.     Defendant will continue, unless restrained, to use Plaintiff's Safety Socket Marks, which will cause irreparable harm to Plaintiff.  Plaintiff has no adequate remedy at law for Defendant's conduct.  Plaintiff is entitled to an injunction restraining Defendant, its officers, agents and employees, and all persons acting in concert with Defendant, from engaging in further acts of unfair competition.

97.     Plaintiff is entitled to corrective advertising, at Defendant's expense, in an amount and manner to be determined, for the purposes of (a) insuring public safety and freedom from confusion and (b) mitigating the damages to Plaintiff's reputation caused by Defendant.

98.     Due to the willful and exceptionally egregious nature of Defendant's wrongful acts, Plaintiff is entitled to and seeks hereby, among other damages, an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**(Deceptive Trade Practices Under 815 ILCS § 510/2, *et seq*.)**

99.     Plaintiff incorporates by reference the preceding Paragraphs 1 – 98 of this Complaint as if fully set forth herein.

100.     Plaintiff's Safety Socket Marks are inherently distinctive, acquiring distinction from other marks through Plaintiff's long, continuous and exclusive use of the Banded Knurl

Mark since 1960, the SAFETY SOCKET word mark since 1931, and the SAFETY SOCKET and Design mark since 2004.

101.    Due to the foregoing and Plaintiff's consistently positive publicity and advertising to its consumer community under the Safety Socket Marks, these marks have become uniquely associated with Plaintiff and identify Plaintiff as the source of Plaintiff's product.  Plaintiff's Safety Socket Marks are valid trademarks under state and federal law.

102.    Defendants have engaged in unfair and deceptive acts and practices which have created a likelihood of confusion or misunderstanding as to the source, sponsorship or approval of the goods they are offering for sale.

103.    Defendant's acts have also created a likelihood of confusion and misunderstanding as to whether Defendant is affiliated, connected or associated with Plaintiff and have created a likelihood of confusion and misunderstanding as to Defendant's goods being affiliated with, connected with and certified by Plaintiff.  Defendant's acts are in violation of the Illinois Uniform Deceptive Trade Practices Act.

104.    Defendants have acted with knowledge of Plaintiff's Safety Socket Marks and with (a) deliberate indifference to the injury to the public and to Safety Socket that will be caused by its trademark infringement and (b) the intent to unfairly benefit from the goodwill symbolized by the Safety Socket Marks.

105.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered, and is continuing to suffer, irreparable injury to its business reputation and loss of goodwill and has incurred, and is continuing to incur, monetary damages.

106.    Plaintiff is entitled to an accounting for Defendant's profits on infringing goods and to recover from Defendant all damages sustained by Plaintiff as well as profits realized by

Defendant as a result of Defendant's wrongful acts. Plaintiff is presently unable to ascertain the full extent of monetary damages it has suffered and which it is entitled to collect from Defendant by reason of Defendant's acts of trademark infringement.

107.    Defendant will continue, unless restrained, to use Plaintiff's Safety Socket Marks, which will cause irreparable harm to Plaintiff. Plaintiff has no adequate remedy at law for Defendant's conduct. Plaintiff is entitled to an injunction, pursuant to 815 ILCS § 510/3, restraining Defendant, its officers, agents and employees, and all persons acting in concert with Defendant, from engaging in further acts of unfair competition.

108.    Plaintiff is entitled to corrective advertising, at Defendant's expense, in an amount and manner to be determined, for the purposes of (a) insuring public safety and freedom from confusion and (b) mitigating the damages to Plaintiff's reputation caused by Defendant.

109.    Defendants have intentionally and willfully engaged in the deceptive trade practices described above. Accordingly, pursuant to 815 ILCS § 510/3 Plaintiff is entitled, and seeks hereby, to recover its costs and attorneys' fees incurred in connection with this lawsuit.

## VI. **JURY DEMAND**

110.    Plaintiff requests a jury trial on all causes of action herein so triable.

## VII. **PRAYER FOR RELIEF**

**WHEREFORE**, for the foregoing reasons, Plaintiff respectfully prays for relief as follows:

1.    Entry of an order and judgment requiring that Defendant and its officers, agents, servants, employees, owners and representatives, and all other persons, firms or corporations in active concert or participation with them, be permanently enjoined and restrained from (a) using the Safety Socket Marks, or any colorable imitation of those marks, in connection with any

goods manufactured by Safety Socket that have been plated, treated or in any way altered through any process not requested or ordered, expressly and in writing, by Safety Socket; (b) using the Safety Socket Marks, or any colorable imitation of those marks, in connection with any goods manufactured by Safety Socket that have not been properly, genuinely and lawfully certified by all necessary persons or entities, including but not limited to, Safety Socket, as meeting all specifications and criteria of any kind required under any applicable federal, state, agency, industry or departmental law, regulation, code or guideline, governing, relating or referring to such goods and the implementation thereof; (c) using the Safety Socket Marks, or any colorable imitation of those marks, in connection with any goods not manufactured by Safety Socket; (d) whether or not in connection with the Safety Socket Marks, acquiring, distributing, selling or dealing in any way with goods manufactured by Safety Socket that have been plated, treated or in any way altered through any process not requested or ordered, expressly and in writing, by Safety Socket; (e) whether or not in connection with the Safety Socket Marks, acquiring, distributing, selling or dealing in any way with goods manufactured by Safety Socket that have not been properly, genuinely and lawfully certified by all necessary persons or entities, including but not limited to, Safety Socket, as meeting all specifications and criteria of any kind required under all applicable federal, state, agency, industry or departmental laws, regulations, codes or guidelines, governing, relating or referring to such goods and the implementation thereof; (f) doing any act or thing calculated or likely to cause confusion or mistake in the minds of members of the public, or current or prospective, direct or indirect, customers of Plaintiff's products, with respect to the source of any products offered for sale, sold or distributed by Defendant, or with respect to Plaintiff's certification, authorization, sponsorship or approval of products offered for sale, sold or distributed by Defendant; or (g) engaging in any

acts constituting trademark infringement, unfair competition or false designation of origin under federal or state law, or constituting a deceptive trade practice under Illinois law.

2.     Entry of an order and judgment requiring Defendant, pursuant to 15 U.S.C. § 1116(a), to file with this Court and serve upon Plaintiff within thirty (30) days after entry of the injunction, a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the injunction and implemented adequate and effective means to discontinue the practices enjoined pursuant to Paragraph 1, hereinabove.

3.     Entry of an order and judgment requiring Defendant, pursuant to 15 U.S.C. §1117, to account for and pay to Plaintiff damages arising from Defendant's violation of the Lanham Act;

4.     Entry of an order and judgment requiring Defendant, pursuant to 15 U.S.C. §1117, to account for and disgorge to Plaintiff all of the profits realized by Defendant or others in active concert or participation with Defendant, relating to the use of the Safety Socket Marks;

5.     Entry of an order and judgment requiring Defendant, pursuant to 15 U.S.C. §1117, to pay to Plaintiff all further damages as deemed appropriate, under the circumstances, including, but not limited to, Plaintiff's costs and reasonable attorneys' fees in connection with this action.

6.     Entry of an order and judgment requiring Defendant, pursuant to 15 U.S.C. §1118, to deliver to Plaintiff, at Defendant's expense, for destruction (a) all infringing goods, including, without limitation, the Doctored Socket Screws, as well as any certifications or copies thereof, relating or purportedly relating to the Doctored Socket Screws, (b) all promotional or sales materials, invoices, certifications, bills of lading or other documents bearing the Safety Socket Marks, used by Defendant in connection with the unlawful conduct described in this

Complaint;

7.     Entry of an order and judgment requiring Defendant, pursuant to 815 ILCS §510/3, granting Plaintiff injunctive relief as requested herein and as the Court may otherwise deem appropriate, and allowing Plaintiff to recover its costs and attorneys' fees incurred in connection with this action;

8.     Entry of an order and judgment requiring Defendant, pursuant to 815 ILCS §510/3 and as otherwise allowed under law, to pay punitive damages to Plaintiff in an amount to be determined;

9.     Entry of an order and judgment requiring Defendant to pay prejudgment interest; and

10.     Entry of an order and judgment granting Plaintiff such other and further relief in its favor and aid as the Court deems just and proper.

Dated: March 18, 2015                                          SHEBAR LAW FIRM

                                                  By:     /s/ Steven M. Shebar
                                                          Steven M. Shebar (#6297608)
                                                          SHEBAR LAW FIRM
                                                          738 Wesley Ave.
                                                          Oak Park, Illinois 60304
                                                          (708) 434-5669

                                                          *Attorneys for Plaintiff Safety Socket LLC*